IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID FLEISHER, MICHAEL CLIME, GARY IPPOLITO, ROBERT L. LIVINGSTON, DAVID TAILLON, on behalf of themselves and all others similarly situated, | : : : : : : | CIVIL ACTION |
| v. | : : | |
| FIBER COMPOSITES, LLC | : | 12-1326 |

**MEMORANDUM**

**Padova, J.**                                                          **March 5, 2014**

This is a putative class action in which Plaintiffs allege that Defendant Fiber Composites, LLC ("Fiber") sold defective decking materials that grew mold and fungus. Plaintiffs, who reside in Pennsylvania, New Jersey, New York, and Massachusetts, have reached a settlement agreement with Fiber, which United States Magistrate Judge Timothy R. Rice has preliminarily approved. Before the Court are Plaintiffs' (1) Unopposed Motion for Final Approval of Action Class Settlement (Docket No. 67) and (2) Motion for Award of Attorneys' Fees, Expenses, and Service Awards (Docket No. 62). One objection to the proposed settlement agreement was filed on October 24, 2013 (Docket No. 63). After a Final Approval Hearing held on November 27, 2013, and for the reasons that follow, the Court grants both Motions.

## I.      BACKGROUND

### A.      Factual History

Plaintiffs' Second Amended Class Action Complaint ("SAC") alleges the following facts. Defendant Fiber[1] manufactured, advertised, and sold Portico™ Series Decking products,

---

[1] Fiber Composites, LLC changed its name to Fiberon, LLC on December 28, 2009. (SAC ¶ 37.)

including Portico™ Advantage and Eclipse™ composite decking ("Portico"), to consumers throughout the United States.  (SAC ¶¶ 1, 2.)  Unlike natural wood decking products, Portico is made up of a composite material comprised of equal parts wood fiber and polyethylene, a thermoplastic material.  (Id. ¶ 3.)  Portico is manufactured by a process of direct extrusion, in which the polyethylene and wood fibers are mixed together and melted in an extruder, then forced through a die to form the finished structural part.  (Id. ¶ 42.)  This process is designed to completely encapsulate the wood fibers in the polyethylene, rendering them virtually moisture proof.  (Id.)  The final Portico product was sold at 1.5 to 2 times the price of natural wood products.  (Id. ¶ 51.)

Fiber expressly warranted Portico for a twenty-year period, guaranteeing that "the Decking & Railing will not check, splinter, peel, rot, or suffer structural damage from fungal decay."  (SAC Ex. A, "Limited Warranty.")  This warranty was limited by a disclaimer that reads:

> THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ANY AND ALL OTHER WARRANTIES WITH RESPECT TO Portico™ FIBER COMPOSITE MATERIAL.  WARRANTOR DISCLAIMS ANY AND ALL OTHER WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.
> . . .
> Purchaser's sole remedy for any claim whatsoever arising out of the purchase, use, storage or possession of Portico™ Fiber Composite Material (whether such claim arises is contract, warranty, tort, strict liability or otherwise), including without limitation any claim that Portico™ Fiber Composite Material failed to perform as warranted above, shall be replaced with new Portico™ . . . in an amount equal to the volume of defective material as scheduled on the prorated warranty schedule.

(Id.)

In addition to the Limited Warranty, Fiber posted language on its website and on contractors' websites stating that Portico decks are unlike "[t]raditional wood decking [that]

2

fades, molds, cracks, splinters, and needs to be treated and sealed regularly for the deck to maintain its original look and feel" (Id. ¶ 52); "Portico Eclipse is slip resistant, has a quality surface finish that reduces dirt and mold buildup and will not check, split, or warp" (Id. ¶ 50); it has "just about eliminated the problems associated with typical wood decking" (Id. ¶ 52); and it is "able to resist moisture penetration and degradation from fungal rot as the plastic encapsulates and binds the wood together." (Id. ¶ 47.) Fiber also stated on its website that "[l]ong after installation, [Portico] . . . will stay beautiful and provide you with years of outdoor enjoyment;" and that Portico has "consistent color throughout the board." (Id. ¶¶ 57-58.)

The named Plaintiffs are consumers from Pennsylvania, New Jersey, New York, and Massachusetts, who purchased Portico decking materials in Pennsylvania, New Jersey, New York and Massachusetts, respectively. (Id. ¶¶ 10-36.) Soon after installation, Plaintiffs noticed dark spotting on the surface of their decks. (Id. ¶¶ 11, 17, 23, 29, 33.) The spotting is allegedly extensive mold, mildew, and/or fungal growth ("fungal growth") resulting in discoloration of the deck surface. (Id. ¶ 6.) Plaintiffs allege that the fungal growth is due to a uniform latent defect in Portico that occurs regardless of proper installation, maintenance, and cleaning, and cannot be prevented or remediated. (Id.) Plaintiffs allege that the manufacturing process is defective because complete encapsulation of the wood fibers does not occur, making Portico susceptible to moisture and microbe penetration to the internal wood fibers. (Id. ¶ 43.) In addition, Portico was manufactured with micro-DOME technology, which creates an embossed surface on the boards which collects standing water and promotes fungal growth. (Id. ¶ 46.) Plaintiffs allege that Fiber knew of this latent defect in the design and manufacture of Portico, but failed to inform consumers of the irremediable defect. (Id. ¶ 66.)

3

After discovering the fungal growth on their decks, Plaintiffs filed complaints with Fiber. (Id. ¶ 7.)  Fiber refused to refund or replace the decks under the Limited Warranty and advised Plaintiffs to chemically clean their decks.  (Id.)  Plaintiffs cleaned their decks as directed, but the chemical products only worked briefly, or failed to work altogether, resulting in the recurrence of the fungal growth.  (Id.)  Fiber has not provided any further relief.  (Id. ¶ 63.)

The SAC asserts the following causes of action:

- Count I: Violation of Magnuson-Moss Consumer Products Warranties Act (all classes)

- Count II: Breach of Implied Warranty of Merchantability (all classes except New York sub-class)

- Count III: Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Pennsylvania sub-class)

- Count IV: Violation of Massachusetts Consumer Protection Act (Massachusetts sub-class)

- Count V: Violation of New Jersey Consumer Fraud Act (New Jersey sub-class)

- Count VI: Violation of New York Consumer Protection Act (New York sub-class)

- Count VII: Declaratory Relief (Injunctive/Declaratory Relief class)

- Count VIII: Unjust Enrichment (all classes)

(Id. ¶¶ 86-160.)

B.     Litigation History

Plaintiffs filed the Complaint on March 14, 2012.  Fiber filed a Motion to Dismiss on May 18, 2012, and Plaintiffs responded by filing their First Amended Complaint on June 11,

2012. Fiber filed a Motion to Dismiss the First Amended Complaint on July 10, 2012. On November 2, 2012, we granted in part and denied in part Fiber's Motion to Dismiss. On December 7, 2012, Fiber filed the Answer to the First Amended Complaint. On January 7, 2013, we referred the case to Magistrate Judge Rice for settlement negotiations.

Following those settlement negotiations, on August 30, 2013, Plaintiffs filed an Unopposed Motion for Preliminary Approval of Class Settlement, Provisional Certification of Settlement Class, Authorization to Disseminate Class Notice, and Appointment of Class Representatives and Class Counsel, which Magistrate Judge Rice granted on September 4, 2013. On August 30, 2013, Plaintiffs and Fiber stipulated that Plaintiffs may file a Second Amended Complaint, which Plaintiffs filed on September 5, 2013. On October 22, 2013, Plaintiffs filed the Motion for Award of Attorneys' Fees, Expenses, and Service Awards for Class Representatives and, on November 13, 2013, the Unopposed Motion for Final Approval of Class Action Settlement. One objection to the proposed settlement agreement was filed by Stan Nordlund on October 24, 2013. On November 19, 2013, we vacated our previous order referring the case to Magistrate Judge Rice. On November 27, 2013, we held a hearing on Plaintiffs' two pending Motions.

C.      The Settlement Agreement

The Class Action Settlement Agreement (Pls.' Unopposed Mot. for Prelim. Approval, Ex. 1 (the "Settlement Agreement")) includes the following terms.

1.      Settlement Class

The Settlement Agreement defines the settlement class (the "Class") as follows: all owners of residences or commercial buildings or other structures (other than commercial

buildings and other structures in "marine environments"[2]) in the United States with a deck constructed of composite decking, railing, or fencing material sold under certain brands or trademarks[3] purchased and installed after March 14, 2008.[4] (Settlement Agreement at 5.)

      2.     <u>Settlement Benefits</u>

Under the proposed settlement, claimants receive different benefits depending on their "tier." Eligible "Tier I" claimants are Class members whose Fiber deck has dark spotting on at least one-third of the deck due to mold, mildew or fungal growth. (<u>Id.</u>) They will receive a voucher for a cleaning product redeemable at Home Depot stores. (<u>Id.</u> at 6.) "Tier II" claimants are those who, after application of the cleaning product, still have visible spotting due to mold, mildew or fungal growth on at least one-third of their deck. (<u>Id.</u>) They will receive an additional voucher for deck stain redeemable at Home Depot stores. (<u>Id.</u> at 7.) "Tier III" claimants, those who still have visible spotting after applying the stain, will receive a voucher for replacement decking material. (<u>Id.</u> at 7-9.)

      3.     <u>Attorneys' Fees</u>

Pursuant to the Settlement Agreement, Fiber will pay, subject to Court approval, a total award to Plaintiffs' and Class Counsel (together, "Counsel") of up to $385,000. (<u>Id.</u> at 15.)

---

[2] "Marine environments" means all commercial properties and other structures where any part of the property or structure is within 500 feet of water. (Settlement Agreement at 5.)

[3] These brands and trademarks are Veranda™ Composites Decking, Veranda™ Traditions Composite Decking, Veranda™ TD Composite Decking, Fiberon™ M Pro Series Composite Decking, Fiberon™ Tropics, Fiberon™ Classic Composite Decking and Portico™ Composite Decking. (Settlement Agreement at 5.)

[4] The Settlement Class excludes the following: (i) those who opted out; (ii) those who previously resolved their claims through a settlement or final judgment; (iii) Fiber, its employees and affiliates; and (iv) the judges to whom the action is assigned or who are presiding over the approval of the settlement. (Settlement Agreement at 5.)

4.    Notice, Opt-Outs and Objections

In accordance with a September 4, 2013 order from Magistrate Judge Rice, Fiber has filed a Declaration of Douglas G. Mancosh attesting that it has provided notice (the "Notice") of the settlement to the Class. (Def.'s Mem. for Final Approval of Class Action Settlement, Ex. 2.) In that declaration, Fiber also attests that nine putative class members have submitted requests for exclusion and that, as of November 12, 2013, 94 class members have submitted claims under the Settlement Agreement. (Id.)

One objection to the proposed Settlement Agreement was filed by Stan Nordlund of Virginia on October 24, 2013.  It objects to the Settlement Agreement on the following grounds: (1) the "Tier I" remedy will be ineffective because no deck cleaner is capable of removing the deck stains; (2) the "Tier II" remedy would stain the deck a different color than the one Plaintiffs originally intended; (3) the "Tier III" remedy does not compensate Plaintiffs for the transportation and labor required to install new decking; (4) the claim forms are intimidating and unreasonable; (5) Fiber should not dictate where to buy cleaning and staining products; and (6) the attorneys' fees are excessive. (Docket No. 63 ("Nordlund Objection") at 1-3.)

Counsel contends that the objection does not pose an obstacle to final approval of the Settlement Agreement.  First, Counsel argues that the objection is procedurally deficient because it does not establish standing as a member of the settlement class as required by the Notice. (Pls.' Mem. for Final Approval of Class Action Settlement at 22-23.)  Second, the objection fails because its author merely disagrees with the relief that the Settlement Agreement provides. (Id. at 23.)  In Counsel's view, the settlement represents a compromise and, therefore, it should not reasonably be expected to fully compensate Plaintiffs or Class members for all potential damages that could be awarded in a successful lawsuit. (Id.)

In addition, Plaintiffs attach two very brief comments opposing the proposed Settlement Agreement. Those comments contend that Fiber is "getting off way too easily" and that the settlement does not adequately compensate Plaintiffs for their injury. (Id., Exs. 7, 8.)

## II.   FINAL CLASS CERTIFICATION

"The Third Circuit has declared that class actions created for the purpose of settlement are recognized under the general scheme of Federal Rule of Civil Procedure 23, provided that the class meets the certification requirements under the Rule." Pozzi v. Smith, 952 F. Supp. 218, 221 (E.D. Pa.1997) (citing In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 792-97 (3d Cir.1995)). The Class was preliminarily certified on September 4, 2013; the Class, however, may not be finally certified for settlement purposes unless it fully satisfies the requirements laid out in Federal Rule of Civil Procedure 23(a) and (b). See In re Cmty. Bank of N. Va., 418 F.3d 277, 299 (3d Cir. 2005) (noting that "the ultimate inquiry into the fairness of the settlement under Fed. R. Civ. P. 23(e) does not relieve the court of its responsibility to evaluate Rule 23(a) and (b) considerations"). In the settlement context, the requirements of Rule 23(a) and (b) call for heightened judicial scrutiny. See, e.g., In re Gen. Motors, 55 F.3d at 784; Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 621 (1997) (stating that the full satisfaction of Fed. R. Civ. P. 23(a) and (b) criteria as a prerequisite to certification is even more important when the case is to be settled without trial). The United States Court of Appeals for the Third Circuit has summarized the legal standard for class certification as follows:

> To be certified, a class must satisfy the four threshold requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). In addition to the threshold requirements of Rule 23(a), parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Rule

> 23(b)(3) . . . provides for so-called "opt-out" class actions [sic] suits. Under Rule 23(b)(3), two additional requirements must be met in order for a class to be certified: (1) common questions must "predominate over any questions affecting only individual members" (the "predominance requirement"), and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy" (the "superiority requirement").

In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004) (internal citations omitted).

For the reasons given below, the Court finds that the proposed Class satisfies the requirements of Rule 23(a) and (b)(3).   Thus, the Court certifies the Class for settlement purposes.

A.      Rule 23(a) Factors

1.      Numerosity

When determining whether a proposed class is sufficiently large such that joinder of all members of the class is impractical, the Third Circuit has noted that "[n]o minimum number of plaintiffs is required . . . , but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds forty, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.22[3][a] (Matthew Bender 3d ed. 1999)).   Here, Fiber's discovery production indicates that it has received hundreds of complaints and claims relating to fungal spotting (Pls.' Mem. at 16-17; Kocher Decl. in Support of Pls.' Mot. for Final Approval of Class Action Settlement ¶ 43.)   Accordingly, the Court finds that the Class satisfies the numerosity requirement of Rule 23(a).

2.      Commonality

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.   Because the requirement

9

may be satisfied by a single common issue, it is easily met . . . ." <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994) (citations omitted).   Here, the Class members' claims share numerous common questions of law and fact.   Namely, Class members must establish: whether there was a common defect (or defects) in Fiber's composite decking; whether Fiber knew of any such defect; whether Fiber had a duty to disclose any such defect; whether Fiber concealed any such defect from the Class; whether Fiber failed to disclose material facts regarding its decking; and whether any defect (or defects) in Fiber's product caused a breach of its implied warranty of merchantability.   As members of the proposed Class share these questions of law and fact, the Court finds that Rule 23(a)'s commonality requirement is satisfied.

        3.     <u>Typicality</u>

"The concepts of commonality and typicality are broadly defined and tend to merge." <u>Baby Neal</u>, 43 F.3d at 56 (citations omitted). "'[A] plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.'" <u>T.B. v. School Dist. Of Phila.</u>, Civ. A. No. 97-5453, 1997 WL 786448, at *4 (E.D. Pa. Dec. 1, 1997) (quoting <u>Paskel v. Heckler</u>, 99 F.R.D. 80, 83 (E.D. Pa. 1983) (alteration in original).   The named plaintiffs' claims need only be sufficiently similar to those of the class such that "the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." <u>Georgine v. Amchem Prods., Inc.</u>, 83 F.3d 610, 631 (3d Cir. 1996), *aff'd sub nom.* <u>Amchem Prods.</u>, 521 U.S. 591 (1997).   Here, the named Plaintiffs' claims are typical of the claims of the members of the proposed Class. The named Plaintiffs and all Class members allegedly have been injured by the same defect on Fiber's products, and purportedly suffered damages as a result.   Accordingly, the Court finds that the typicality requirement is satisfied.

4.    Adequacy of Representation

"The adequacy of the class representative is dependent on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class." In Re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D. Pa. 2001) (citations omitted).  With respect to the first factor, Counsel have submitted firm resumes (Kocher Decl. in Support of Pls.' Mot. for Award of Attys' Fees ¶¶ 2-3, Exs. A1, B1) which attest to their considerable experience in class action litigation and their successful prosecution of such cases in courts throughout the country.  The Court, therefore, finds that Counsel is competent to conduct this class action.

The second factor that must be considered when evaluating adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., 521 U.S. at 625.  For this factor to be satisfied, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (quoting Schlesinger v. Reservists Comm. To Stop the War, 418 U.S. 208, 216 (1974)); see also Georgine, 83 F.3d at 630 (finding class representative inadequate because the proposed settlement made "important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others") (emphasis in original).  Consequently, the adequacy of representation requirement is not satisfied where "the named representative's interest in maximizing its own recovery provides a strong incentive to minimize the recovery of other class members." Yeager's Fuel v. Pa. Power & Light Co., 162 F.R.D. 471, 478 (E.D. Pa. 1995).  Here, Plaintiffs' claims are co-extensive with those of members of the putative class.  All assert the same legal claims, and all seek identical relief.  Thus, since Counsel is competent to

11

conduct a class action, and since Plaintiffs do not have interests in this action that are antagonistic to the interests of the Class members, the Court finds that Plaintiffs satisfy the adequacy of representation requirement.

B.     Rule 23(b)(3) Factors

1.     Predominance

Rule 23(b)(3) requires that "the questions of law or fact common to the class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandates that it is far more demanding than the Rule 23(a)(2) commonality requirement." In re LifeUSA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001) (citing Amchem Prods., 521 U.S. at 623-24).

The Court finds that common questions of law and fact — including whether Fiber's wood-plastic composite products are defective, whether Fiber knew as much and concealed its knowledge, and whether Fiber had a duty to disclose what it knew — predominate in this case. "Finally, the fact that plaintiffs allege purely an economic injury . . . and not any physical injury, further supports a finding of commonality and predominance because there are little or no individual proof problems in this case otherwise commonly associated with physical injury claims." In re Warfarin, 391 F.3d at 529. Accordingly, the Court finds that Rule 23(b)(3)'s predominance requirement is met.

2.     Superiority

"The superiority requirement [of Rule 23(b)(3)] 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" In re Warfarin, 391 F.3d at 533-34 (quoting In re Prudential Ins. Co. of Am.

12

Sales Practice Litig., 148 F.3d 283, 316 (3d Cir. 1998)).  The considerations relevant to this determination are:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum . . . .[5]

Fed. R. Civ. P. 23(b)(3).

Here, a class action is superior to other methods of adjudication.  First, there appears to be little interest on behalf of the members of the proposed Class to litigate their claims individually, and the potential recovery of these Class members would be just a fraction of that amount – a sum easily subsumed by the various fees and expenses of a complex suit.  See In re Warfarin, 391 F.3d at 534; see also Orloff v. Syndicated Office Sys., Inc., Civ. A. No. 00-5355, 2004 WL 870691, at *5 (E.D. Pa. Apr. 22, 2004) (finding a class action to be the superior method of adjudication, "because it provides an efficient alternative to individual claims, and because individual Class members are unlikely to bring individual actions given the likelihood that their litigation expenses would exceed any potential recovery").  Second, the Court is not aware of any other litigation begun by or against the class members.  Third, it is desirable in this case to concentrate many smaller claims into a single forum because doing so conserves judicial resources and promotes adjudicatory consistency.

---

[5] There is also a fourth consideration: "(D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). The Court, however, need not consider this final factor in the context of a settlement-only class certification. See Amchem Prods., 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. R. Civ. Proc. [sic] 23(b)(3)(D), for the proposal is that there be no trial.").

Thus, the Court concludes that the proposed Class satisfies all of the relevant requirements of Rule 23(a) and (b) and, therefore, approves final certification of the Class for the purposes of settlement.

## III.   MOTION FOR FINAL APPROVAL OF SETTLEMENT

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). "While the law generally favors settlement in complex or class action cases for its conservation of judicial resources, the court has an obligation to ensure that any settlement reached protects the interests of the class members." In re Aetna Inc. Sec. Litig., MDL No. 1219, 2001 WL 20928, at *4 (E.D. Pa. Jan 4, 2001) (citing In re Gen. Motors, 55 F.3d at 784). Consequently, prior to approving a settlement, the Court must determine whether the Notice provided to class members was adequate. Id. (citations omitted). The Court must also "scrutinize the terms of the settlement to ensure that it is 'fair, adequate and reasonable.'" Id. (quoting In re Gen. Motors, 55 F.3d at 785). "[C]ases such as this, where the parties simultaneously seek certification and settlement approval, require 'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." In re Prudential, 148 F.3d at 317 (quoting In re Gen. Motors, 55 F.3d at 805).

### A.   Adequacy of Notice

The due process demands of the Fifth Amendment and the Federal Rules of Civil Procedure require adequate notice to class members of a proposed settlement. In re Aetna, 2001 WL 20928, at *5. "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." In re Prudential, 148 F.3d at 306 (citing Phillips Petroleum Co. v.

14

Shutts, 472 U.S. 797, 811-12 (1985)).  The due process requirements of the Fifth Amendment are satisfied by the "combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class."  Id.  The notice must be "'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  Lachance v. Harrington, 965 F. Supp. 630, 636 (E.D. Pa. 1997) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

Moreover, "in a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e)."  In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., 226 F.R.D. 498, 517 (E.D. Pa. 2005) (citing Carlough v. Amchem Prods., Inc., 158 F.R.D. 314, 324-25 (E.D. Pa. 1993)). Rule 23(c)(2) provides that class members must receive the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) also requires that "the notice indicate an opportunity to opt out, that the judgment will bind all class members who do not opt out and that any member who does not opt out may appear through counsel."  In re Diet Drugs, 226 F.R.D. at 517 (citing Fed. R. Civ. P. 23(c)(2)).

In addition to the requirements of Rule 23(c)(2), Rule 23(e) "requires that notice of a proposed settlement must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing."  Id. at 517-18 (citation omitted).  The court should consider both "the mode of dissemination and its content to assess whether notice was sufficient."  Id. at 518.  Although the "notice need not be unduly

specific . . . the notice document must describe, in detail, the nature of the proposed settlement, the circumstances justifying it, and the consequences of accepting and opting out of it." Id.

The Court finds that the Notice provided in this case satisfied the requirements of due process and the Federal Rules of Civil Procedure. The Notice program that the Court preliminarily approved on September 4, 2013 was fully implemented. (Kocher Decl. in Support of Pls.' Mot. for Final Approval of Class Action Settlement ¶ 77.) The Claims Administrator sent 69 Notices via email and 1,971 Notices via U.S. mail to Class members identified through Fiber's records. (Id. ¶ 78.) Further, the Notice and other relevant case documents and information were posted on the dedicated settlement website, www.fiberonsettlement.com, established by Fiber. (Id. ¶ 79.) Notice was also published in *USA Today*, National Edition, on September 19, 2013; in the *Wall Street Journal* on October 25, 2013; on the Professional Deck Builder Magazine Web site (www.deckmagazine.com) beginning on October 7, 2013 and running through at least the first week of November, 2013; on the ProSales Magazine website (www.prosalesmagazine.com) beginning on October 23, 2013 and running through at least the first week of November, 2013; and on JLC Magazine website (jlconline.com) beginning on October 23, 2013 and running through at least the first week of November, 2013. (Id. ¶ 80.) This published Notice, mailed Notice, and web Notice constituted the best practicable notice under the circumstances, satisfying both due process and Rule 23. See Esslinger v. HSBC Bank Nev., N.A., No. 10-3213, 2012 WL 5866074, at *5-6 (E.D. Pa. Nov. 20, 2012) (finding that email and postcard notice meet the requirements of Rule 23 and due process).

The Court also finds the content of the Notice to be adequate under the Due Process Clause and Rule 23. The Notice described the nature and background of this action and defines the Class, Class claims, and consequences of Class membership. (Mancosh Decl., Ex. A at 1-5.)

It summarized the terms of the Settlement Agreement, including the release provisions of the Settlement Agreement; and the attorneys' fees, expenses, and incentive award for which Counsel may apply. ( Id. at 3-5.)  The Notice also detailed how to submit a proper and timely Proof of Claim form, advising Class members that, if they failed to submit a proper Proof of Claim form by the specified deadline, they may be barred from any recovery though still bound by the final disposition of the litigation. (Id. at 3-4.)  The Notice alerted Class members to their right to request exclusion from the Class, and detailed the procedure for and consequences of doing so. (Id.)  The Notice informed Class members of the time and date of the Final Approval Hearing, advising them of the nature and purpose of the Hearing.  (Id. at 2, 5.)  The Notice included the contact information of the relevant attorneys and of the Settlement Administrator, and also directs Class members to the dedicated website, where copies of the Notice, the Settlement Agreement, and other documents pertaining to the case may be found. (Id. at 3-5.)  After reviewing the Notice, the Court concludes that its substance, like the method of its dissemination, is sufficient to satisfy the concerns of due process and Rule 23.  See In re Prudential, 148 F.3d at 328; In re Aetna, 2001 WL 20928, at *5 (citing In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 175 (E.D. Pa. 2000)).

      B.      <u>Presumption of Fairness</u>

Rule 23(e) of the Federal Rules of Civil Procedure requires that the Court must approve any settlement of a class action and states that the Court may only approve a settlement "after a hearing and on finding that the [settlement, voluntary dismissal, or compromise] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Third Circuit has determined that a court should accord a presumption of fairness to settlements if the court finds that: "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the

settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Cendant Corp. Litig., 264 F.3d 201, 233 n.18 (3d Cir. 2001).

The Settlement Agreement in this case is entitled to a presumption of fairness. The Settlement Agreement resulted from arms' length negotiations: three mediation sessions with Fiber's counsel and Magistrate Judge Rice, as well as from additional telephonic sessions with Fiber's counsel. (Kocher Decl. in Support of Pls.' Mot. for Final Approval of Class Action Settlement ¶¶ 44-48, 52, 59-60.) The Settlement Agreement was reached after extensive discovery, involving the production of over 10,000 pages of documents in response to Plaintiffs' forty document requests. (Id. ¶ 42.) Plaintiffs analyzed this discovery, which included warranties, installation instructions, promotional and marketing materials, and over 7,000 pages of emails. (Id. ¶ 43.) Plaintiffs also conferred with their consulting experts regarding the alleged defect. (Id. ¶ 31.) As already discussed, Counsel has extensive experience litigating class actions such as the one at hand. Lastly, one out of over 150,000 Class members filed an objection to the Settlement Agreement. (Id. ¶ 89.) Accordingly, the Court will apply a presumption of fairness in analyzing the Settlement Agreement.

C.    The *Girsh* Factors

The Third Circuit developed a nine-factor test in Girsh, "which provides the analytic structure for determining whether a class action settlement is fair, reasonable, and adequate under Rule 23(e)." In re Cendant, 264 F.3d at 231 (citation omitted). The nine factors are:

> (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

Id. at 232 (citing Girsh, 521 F.2d at 157).  Upon consideration of these factors, the Court

finds that the proposed Settlement Agreement is fair, reasonable, and adequate.[6]

> 1.   Complexity, Expense, and Likely Duration of the Litigation

"This factor captures 'the probable costs, in both time and money, of continued

litigation.'"  Id. at 233 (citing In re Gen. Motors, 55 F.3d at 812).  Here, in the absence of

settlement, significant costs in terms of both time and money likely would result from the

continued litigation of this case.  In addition to discovery costs, continued litigation potentially

would have entailed various dispositive motions and a substantial trial.  Whatever the disposition

of the case, litigation likely would have continued for some time thereafter through post-trial

motions and appeal.  The time and resources saved by the avoidance of these costs would benefit

all parties.  See In re Warfarin, 391 F.3d at 536 ("[I]t was inevitable that post-trial motions and

appeals would not only further prolong the litigation but also reduce the value of recovery to the

class."); In re Aetna, 2001 WL 20928, at *6 (noting that "[t]he risk of delay could have

deleterious effects on any future recovery due to the time value of money").  Thus the Court

finds that the complexity, expense, and likely duration of the litigation favor settlement.  See In re

Prudential, 148 F.3d at 318 ("[T]he trial of this class action would be a long, arduous process

requiring great expenditures of time and money on behalf of both the parties and the court. The

prospect of such a massive undertaking clearly counsels in favor of settlement.").

---

[6] As the Third Circuit has recently noted, "The *Girsh* factors do not provide an exhaustive list of factors to be considered when reviewing a proposed settlement." In re AT & T Corp. Sec. Litig., Civ. A. Nos. 05-2727, 05-2728, 2006 WL 2021033, at *3 (3d Cir. July 20, 2006).  In In re Prudential, for instance, the Third Circuit enumerated a list of additional considerations which may be relevant to a court's assessment of the fairness of a class action settlement.  148 F.3d at 323.  After thorough review of the proposed Settlement Agreement in this case, the Court has found that all considerations relevant to its assessment of the Settlement Agreement's fairness are fully covered by the Court's analysis of the adequacy of the Notice and the nine Girsh factors.

2.     The Reaction of the Class

This factor "attempts to gauge whether members of the class support the settlement." Id.

As stated above, Notice of this settlement was disseminated thoroughly by means of publication

and first-class mail, and informed potential Class members of their rights to object to the

settlement and to request exclusion from the Class.   The deadline for filing objections and

requesting exclusion was October 31, 2013.   One objection and nine requests for exclusion have

been filed.  (Kocher Decl. ¶ 71.)  This small number of objections, coupled with such a low opt-

out rate, argues in favor of the proposed Settlement Agreement.  See, e.g., In re Prudential, 148

F.3d at 318 (affirming district court's conclusion that class reaction was favorable when 19,000

out of 8,000,000 class members opted out and 300 objected); In re Processed Egg Prods.

Antitrust Litig., 284 F.R.D. 249, 269 (E.D. Pa. 2012) (characterizing an opt out rate of 1.14% of

notice addressees as de minimis); In re Ikon, 194 F.R.D. at 175 (approving settlement with 2,500

opt out requests from an original notice to 140,000 settlement class members).

3.     The Stage of the Proceedings and the Amount of Discovery Completed

This Girsh factor requires the Court to evaluate whether Plaintiffs had an "adequate

appreciation of the merits of the case before negotiating" the settlement.   In re Prudential, 148

F.3d at 319 (internal quotation omitted).   Counsel reportedly analyzed about 10,000 pages of

discovery documents produced in response to Plaintiffs' forty requests for production of

documents.  Thus, a reasonable amount of discovery has been done — enough to give both sides

a fairly accurate view of the risks of continued litigation.

4, 5 & 6.       Risks of Establishing Liability and Damages and of Maintaining
                the Class Action Through Trial

These three Girsh factors require the Court to "survey the potential risks and rewards of

proceeding to litigation in order to weigh the likelihood of success against the benefits of an

20

immediate settlement." In re Warfarin, 391 F.3d at 537.  As to the risks of establishing liability, this factor "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." In re Gen. Motors, 55 F.3d at 814.  As to damages, this factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." In re Cendant, 264 F.3d at 238-39 (quoting In re Gen. Motors, 55 F.3d at 816).  Finally, "[b]ecause the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor [concerning the risks of maintaining the class action through trial] measures the likelihood of obtaining and keeping a class certified if the action were to proceed to trial." In re Warfarin, 391 F.3d at 537 (internal quotations omitted).

 With respect to liability and damages, Plaintiffs emphasize that even though they believe they would ultimately prevail at trial, there are risks inherent in going to trial against a large company with talented defense counsel. (Pls.' Mem. at 17-18.)  They also note that they may not be successful in establishing the defects in the products at issue, which would likely require substantial expert discovery on both sides. (Pls.' Mem. at 18.)  Additionally, they note that there would likely be Daubert challenges, which could limit Plaintiffs' expert testimony with respect to the design defect claim. (Id.)  Likewise, with respect to the risk of maintaining the class action through trial, the Third Circuit Court of Appeals has recognized that "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." In re Prudential, 148 F.3d at 321.  The Court therefore finds that the risks of continued litigation weigh in favor of an early settlement.

7.    Ability of the Defendant to Withstand a Greater Judgment

The seventh Girsh factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." In re Cendant, 264 F.3d at 240. Here, by Counsel's own admission, Fiber could likely withstand a greater judgment. (Pls.' Mem. at 20.)   Thus, this factor weighs against settlement.   Even so, this conclusion in itself is not determinative in evaluating the fairness of the Settlement Agreement. See Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 116 (E.D. Pa. 2005) ("[the defendant] could certainly withstand a much larger judgment as it has considerable assets. While that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages."). Accordingly, the Court finds that this factor disfavors settlement, albeit slightly.

8 & 9.  Range of Reasonableness (in Light of Best Possible Recovery and Risks of Litigation)

The eighth and ninth Girsh factors "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." In re Aetna, 2001 WL 20928, at *11 (citing In re Prudential, 148 F.3d at 322). In making this assessment, the Court compares "'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing,'" with "'the amount of the proposed settlement.'" In re Gen. Motors, 55 F.3d at 806 (quoting MCL 2d § 30.44). The damages estimates should "generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside." Id. (citation omitted). "The primary touchstone of this inquiry is the economic valuation of the proposed settlement." Id. "In making this assessment, the evaluating court must recognize that "settlement represents a compromise in

22

which the highest hopes for recovery are yielded in exchange for certainty and resolution and guard against demanding too large a settlement based on the court's own view of the merits of the litigation." In re Aetna, 2001 WL 20928, at *11 (citing In re Gen. Motors, 55 F.3d at 806).

Plaintiffs emphasize that the great costs of continuing litigation would outweigh any potential for greater recovery at trial. (Pls.' Mem. at 22.) Plaintiffs further state that the Settlement Agreement provides immediate relief to remediate the fungal spotting giving rise to the claims of Plaintiffs and the Class and, if unsuccessful, it also provides monetary relief to the Class. (Id.) Moreover, there is no indication that the settlement amount has been reached inappropriately, or should otherwise be considered suspect; both parties have demonstrated willingness and ability to litigate this action, have engaged in mediation with the assistance of the Court. See In re Aetna, 2001 WL 20928, at *11 ("Additionally, the hallmarks of a questionable settlement are absent. Plaintiffs will receive a significant monetary settlement, and there is no suggestion of collusion between Defendants and Plaintiffs' counsel.") (internal quotation marks omitted). Accordingly, the Court finds that the Settlement Agreement represents a reasonable compromise in light of both the best possible recovery and the risks of litigation.

Thus, of the nine Girsh factors, the Court finds that only one — Fiber's ability to withstand greater judgment — disfavors the proposed Settlement Agreement. This one factor is outweighed by the other Girsh factors favoring the Settlement Agreement. The Court, therefore, concludes that the Settlement Agreement is fair, adequate, and reasonable.

## IV.   MOTION FOR ATTORNEYS' FEES

Plaintiffs request attorneys' fees in the amount of $385,000 (inclusive of $15,601.53 in unreimbursed litigation expenses), and service awards of $2,500 for each of five named Plaintiffs. (Pls.' Mot. for Award of Attys' Fees at 1.)

A.   Attorneys' Fees

An award of attorneys' fees is a discretionary matter, considering the unique factors of the case.   See In re Computron Software, 6 F. Supp. 2d 313, 321-23 (D.N.J. 1998); In re Prudential, 148 F.3d at 338.   There are two conventional methods of calculating attorneys' fees in class actions — the percentage of recovery method and the lodestar method.   See In re Prudential, 148 F.3d at 333.   Here, we have a case for which the lodestar method is appropriate, as "the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method."   Id.

The lodestar method is a two-step process.   The first step requires that court ascertain the lodestar figure by multiplying the number of hours reasonably worked by the reasonable normal hourly rate of counsel.   The second step permits the court to adjust the lodestar by applying a multiple to take into account the contingent nature and risks of the litigation, the results obtained and the quality of the services rendered by counsel.   See Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161, 167-68 (3d Cir. 1973).

1.   Calculation of the Lodestar

Here, Counsel have spent, in the aggregate, 1,149.5 hours in the prosecution of this case through August 30, 2013, the date the Settlement Agreement was executed.   (Kocher Decl. in Support of Pls.' Mot. for Award of Attys' Fees ¶ 9, Exs. A, B.)   Counsel incurred these hours by performing tasks such as investigating legal claims and factual allegations; researching and preparing complaints and briefs; propounding discovery requests; analyzing documents and data produced by Fiber; working with expert consultants; and negotiating the Settlement Agreement. (Id. ¶¶ 68-69.)   Given the effort expended and the complexity of the legal and factual issues involved, we find that these hours are reasonable.

24

To arrive at the lodestar, we multiply the hours expended by each attorney's respective hourly rate. The hourly rate to be applied is that which is normally charged in the community where the attorney practices. In re Fine Paper Antitrust Litig., 751 F.2d 562, 590-91 (3d Cir. 1984). Applying Counsel's rates to the hours committed to the litigation results in a lodestar of $518,976.00 (inclusive of $15,601.53 in costs). (Kocher Decl. in Support of Pls.' Mot. for Award of Attys' Fees ¶ 70.) Considering the various rates charged by counsel in this case and the average rate of counsel of comparable experience in the appropriate geographic area, we determine Counsel's average rate of approximately $430.00 per hour to be reasonable.

        2.    Lodestar Multiplier

In the second step of the analysis, the court adjusts the lodestar to take into account, among other things, the result achieved, the quality of the representation, the complexity and magnitude of the litigation, and public policy considerations. In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305-06 (3d Cir. 2005). Here, as noted above, the lodestar for the services performed by Counsel is $518,976. (Kocher Decl. in Support of Pls.' Mot. for Attys' Fees ¶ 70.) Counsel seek an award of $385,000 for attorneys' fees (including reimbursement of litigation expenses). (Pls.' Mot. for Award of Attys' Fees at 1.) Therefore, the requested fee represents a multiplier of 0.74.

Where, as here, counsel requests a fee that represents less than their lodestar, "there is no need to discuss multipliers and the appropriateness of an increase to the lodestar." Chakejian v. Equifax Info. Servs., 275 F.R.D. 201, 217 (E.D. Pa. 2011) (finding that "the provision for attorneys' fees and costs as laid out in the settlement agreement [was] eminently reasonable, judging from the lodestar.") Moreover, the $385,000 in requested attorneys' fees is under inclusive, as it does not reflect the work performed by Counsel following execution of the

Settlement Agreement, including time spent preparing the instant motions; preparing for the hearing on those motion; and responding to inquiries from Class members. Accordingly, we find that Counsel's request for $385,000 in attorneys' fees (including litigation expenses) is reasonable.

B.   Costs

"Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." In re Aetna, 2001 WL 20928, at *13 (citing In re Ikon, 194 F.R.D. at 192). Here, Counsel have requested reimbursement of litigation expenses incurred in the prosecution of this case, totaling $15,601.53. (Pls.' Mem. in Support of Mot. for Award of Attys' Fees at 1; Kocher Decl. in Support of Pls.' Mot. for Award of Attys' Fees ¶ 76.) The Court finds that the requested expenses are reasonable.

C.   Awards to Representative Plaintiffs

Plaintiffs have asked the Court to approve service awards to each named Plaintiff in the amount of $2,500. (Pls.' Mem. in Support of Mot. for Award of Attys' Fees at 15.) "'Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quoting In re So. Ohio Corr. Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997)). It is particularly appropriate to compensate named representative plaintiffs with incentive awards where they have actively assisted plaintiffs' counsel in their prosecution of the litigation for the benefit of a class. Tenuto v. Transworld Sys., Inc., Civ. A. No. 99–4228, 2002 WL 188569, at *5 (E.D. Pa. Jan.31, 2002); see also In re Linerboard, 2004 WL 1221350, at *18 ("Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated

26

accordingly.") (citing In re Plastic Tableware Antitrust Litig., Civ.A.No. 943564, 2002 WL 188569 (E.D. Pa. Dec.4, 1998)).  The named Plaintiffs in this case have worked closely with Counsel throughout the investigation, prosecution and settlement of the claims in this litigation. (Pls.' Mem. in Support of Mot. for Award of Attys' Fees at 15-16.)  Moreover, the incentive awards requested in this case are similar to the awards approved in comparable class actions in this judicial district.  See In re Linerboard, 2004 WL 1221350, at *19 (approving incentive awards of $25,000 to each of five named plaintiffs); Tenuto, 2002 WL 188569, at *5 (approving $2,000 incentive award to named plaintiff); In re Residential Doors Antitrust Litig., MDL No. 1039, Civ. A. Nos. 94–3744, 96–2125, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) (approving $10,000 incentive awards to each of four named plaintiffs).  Accordingly, the Court finds that the requested incentive payments are reasonable.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that the Class meets the certification requirements of Federal Rule of Civil Procedure 23 and approves the Class's final certification for settlement purposes.  The Court also concludes that the Settlement Agreement is fair, adequate and reasonable, and approves it.  The Court further concludes that Counsel's requested attorneys' fees in the amount of $385,000.00 (including unreimbursed litigation expenses of $15,601.53), and the $2,500 service awards for each of the five named Plaintiffs, are fair and reasonable, and approves them.  An appropriate Order follows.

BY THE COURT:

John R. Padova, J.

27